# APPELLATE COURTS OF ILLINOIS.

## FIRST DISTRICT—OCTOBER TERM, 1900.

### John M. Mueller, Jr., v. Northwestern University.

1. CONTRACTS—*Rules of Construction.*—In construing a contract, effect must be given, if possible, to every sentence, phrase and word of the entire instrument.

2. SAME—*Effect of Restrictive Clauses Against Assignment.*—A, the owner of a building which is being erected, contracts with B for the furnishing and putting in place by B of material in the building, the contract containing an express provision that B shall not assign the contract or any part of it, or any interest in it, to any person, without having first obtained the written consent of C, A's architect, to the assignment. *Held,* that B can not, without first having obtained such consent, assign any part of or interest in the contract to D, so as to confer on D any right as against A.

3. SAME—*Assignability—The General Rule.*—An agreement to pay money or to deliver goods may be assigned by the person to whom the money is to be paid, or the goods are to be delivered, if there is nothing in the terms of the contract, whether by requiring something to be afterward done by him, or by some other stipulation, which manifests the intention of the. parties that it shall not be assignable.

4. SAME—*To be Construed Against, the Party Drafting it.*—A contract will be construed most strongly against the party drafting it.

**Bill of Interpleader.**—Appeal from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the October term, 1900. Affirmed. Opinion filed May 23, 1901.

**Statement.**—The Northwestern University, appellee, filed its bill of interpleader against appellant, John M. Mueller, and others, alleging, in substance, that November

2, 1896, it contracted with Fred H. Sammis, for him to do the marble and mosaic work on the Illinois Trust and Savings Bank building, then being erected at the corner of LaSalle and Jackson streets in the city of Chicago, for the sum of $27,344; that he has completed his contract and has furnished extra labor and material to the amount of $509.39; that complainant has paid to him the following amounts at the times mentioned:

| | |
|---|---|
| March 15, 1897 | $ 600.00 |
| March 20, 1897 | 1,500.00 |
| April 8, 1897 | 2,000.00 |
| April 15, 1897 | 4,000.00 |
| April 24, 1897 | 9,500.00 |
| May 1, 1897 | 5,000.00 |
| May 21, 1897 | 850.00 |

and that there is still due and owing under said contract, including said extra labor and materials, the sum of $4,403.39; that John M. Mueller claims that he, by assignment from Sammis, is entitled to recover the amount yet due and owing as aforesaid, and has commenced an action at law in this court, in the name of Sammis, for his use, against complainant, to recover the same; that September 20, 1897, Mueller filed in this court his petition for a mechanic's lien on said premises, claiming that he furnished to Sammis labor and material to be used in said building, of the value of $17,142.69, and has been paid therefor only $5,000, and that he is entitled to a lien on the premises for the balance remaining due from complainant to Sammis; that two other parties (naming them) have commenced suits against complainant for money due under said contract, one January 28, 1898, for $292.89, and the other August 13, 1897, for the entire amount thereof; that complainant has always been willing to pay the amount due as aforesaid, to such persons as should be lawfully entitled to receive the same, and does not collude with any of the defendants, etc. Prayer that the defendants may be required to interplead, etc., and that complainant may be allowed to pay into court said sum of $4,403.39, for the benefit of whomsoever

may appear to be entitled thereto, and that Mueller may be enjoined from prosecuting said action at law and said mechanic's lien suit, etc.

A copy of the contract between appellee and Sammis is attached to the bill and made a part thereof, which contains the following provision :

" That it is further mutually covenanted and agreed that the contractor shall not sell, assign, transfer or set over this contract, or any part thereof, or interest therein, unto any person or persons whomsoever, without the consent in writing of the architects previously had and obtained thereto; and any such sale, assignment or transfer, without such written consent of the architects first obtained thereto, shall be absolutely null and void; provided, however, that in case said owner or architects consent to the assigning of this contract, the person or persons taking the assignment of the entire interest of said contractor, shall, in writing, under his, its or their hands and seals, assume this contract and all the covenants, conditions, obligations and agreements which are herein assumed by the said contractor, but such assignment shall not release or discharge said contractor from the obligations or covenants herein contained to be performed by him without the express consent thereto of said owner in writing under its hand and seal, which consent the said owner shall be at liberty to withhold at its free will and pleasure."

Mueller filed an answer, denying that the university did not owe Sammis more than the amount of $4,403.39, and averring that it owed at least $12,000, admitting the commencement of suits as averred in the bill, setting forth the petition, etc., in the mechanic's lien suit, and averring an assignment by Sammis to him by virtue of which he became entitled to all moneys remaining unpaid at the time of the assignment, etc. Mueller also filed a cross-bill, in which he alleges the execution to him by Sammis of the following document, at its date :

" CINCINNATI, OHIO, December 4, 1896.
It is agreed by and between Fred H. Sammis and John M. Mueller, Jr., that inasmuch as said Mueller signed the bond of said Sammis in favor of the Northwestern University Board of Directors of Chicago for $8,000, providing

Mueller v. Northwestern University.

that said Sammis shall complete and faithfully carry out his contract with said university owners to furnish the marble and tile work required in a new building said owners are about to erect, said contract price being about $27,430, and in consideration thereof said Sammis agreed to fully indemnify and save harmless said Mueller from any loss by reason thereof; and, whereas, said Mueller is also a sub-contractor under Sammis to furnish certain imported marble for said building, and said Mueller desires, in addition to his protection under the Illinois lien laws, and without waiving same, to be protected for such materials and to secure other liabilities now owing and which may become owing to said Mueller from said Sammis growing out of the said premises, or out of any other business in the future, said Sammis hereby agrees and does transfer to said Mueller all the moneys, credits or choses in action, estimates, orders, etc., which may be made payable to him, or come to him under this, Sammis', contract, or extra work and materials to be furnished by said Sammis, directly or indirectly, by said owners and their architects and superintendents, except only such sums as may be due or owing to other materialmen, sub-contractors or laborers outside of Mueller, and which said owners or their agents are compelled by the lien laws to pay, and for the actual sums due the same respectively, it is agreed that such moneys and credits shall be retained by said Mueller and applied to any indebtedness which he may owe against said Sammis, and that the surplus, if any, in payment of all debts, losses and damages accruing to said Mueller by reason of the premises, shall not become due or payable until said indebtedness to said Mueller, as aforesaid, shall be fully paid and said building completed, and said contract between said Sammis and said owners fully carried out, and the entire money provided for said Sammis in his said contract with said owners, together with extras, shall be fully paid to said Mueller, and said Mueller fully protected in the premises; said Sammis agrees that at any time hereafter he will execute such further orders, transfers and documents which may become necessary to carry out this agreement, or which may be required by said owners, their architects and superintendents, or which said Mueller may demand.

FRED H. SAMMIS,
JOHN M. MUELLER, JR."

It is averred in the cross-bill that the university had due

notice of said assignment; that Mueller furnished the marble and tile work which went into the building, amounting to $17,142.69, for which he received, May 8, 1897, a payment of $5,000, leaving due him $12,142.69; that Sammis' contract was fully performed to the satisfaction of the university, and, by reason thereof, more than $17,142.69 became due to Sammis, which sum was properly and solely payable to cross-complainant.

The answer of the university to the cross-bill admits the execution by Sammis to Mueller of the assignment, at its date, denies notice to it of the assignment, and avers that the only notice given by Mueller was the following, in a letter of date December 11, 1896, from Mueller to D. H. Burnham & Co., the university's architects:

"No doubt Mr. Sammis has informed you that he has secured me by a transfer of the moneys coming to him under his contract, to secure me for the marble, for the bond and for the indebtedness, excepting the amounts actually due the laborers and material-men under Sammis;" and that neither it, nor its said architects, had any notice of said assignment until long after it had paid to Sammis all money due him except said sum of $4,403.39; that it knows not what materials Mueller furnished, or the amount thereof, or what is due to him from Sammis, etc.

The other defendants to the bill filed pleadings, setting up their claims, respectively, which claims were defeated, and none of the defendants, except Mueller, appealed. The issues having been made up, by replications filed to the answer of Mueller to the bill, and the answer of the university to the cross-bill, the cause was referred to a master to take proofs and report the same, with his conclusions of law and fact. The master reported, as his conclusions: First, that the assignment having been made without the written consent of the architects, Mueller was not entitled to recover by virtue of the assignment, as against the university; second, that, after the execution of the assignment, there was a verbal agreement between Sammis and Mueller that the former should collect the money which should

Mueller v. Northwestern University.

become due from the university; third, that Mueller was entitled to a lien for the amount due to Sammis, namely, $4,403.34, when his lien notice was served.

October 21, 1899, the court ordered the university to pay into court the sum of $4,403.39, which it, by its bill, had admitted to be in its possession, etc., and, October 24, 1899, on motion of Mueller, ordered the said sum, less $100, to be paid to Mueller's solicitors for him.

The court, in its final decree, entered April 7, 1900, found that said money having been paid to said solicitors, as theretofore ordered, Mueller was no longer entitled to a mechanic's lien, and ordered that the sum of $100 remaining in court, less certain costs, should be paid to Mueller's solicitors in further satisfaction of the mechanic's lien to which he was formerly entitled. The court, by its decree, adjudged that the assignment from Sammis to Mueller was of no effect as against the university, etc., and that Mueller was entitled to receive the balance due on the Sammis contract, solely by virtue of his mechanic's lien.

Newman, Northrup & Levinson, attorneys for appellant.

Follansbee & Follansbee, attorneys for appellee.

Mr. Presiding Justice Adams delivered the opinion of the court.

Appellant has received $4,403.39, less costs of suit, plus $5,000 paid to him by Sammis. For the recovery of the difference between the amount he has received and the amount of his bill for material furnished to Sammis for use in appellee's building, he relies solely on the assignment from Sammis to him. The contract between the Northwestern University and Sammis contains this clause:

"It is further mutually covenanted and agreed that the contractor shall not sell, assign, transfer or set over this contract, or any part thereof, or interest therein, unto any person or persons whomsoever, without the consent in writing of the architects previously had and obtained thereto; and any such assignment or transfer, without such written assent of the architects first obtained thereto, shall be absolutely null and void," etc.

D. H. Burnham & Co. were the architects of the building. It is not claimed that either the architects or the university consented in writing or orally to the assignment. The appellee contends that the assignment having been made without the consent, written or otherwise, of the architects, conferred no rights on Mueller, the assignee, as against the university; that it is invalid as to the university. Appellant contends the contrary. The question may be stated abstractly thus: If A, the owner of a building which is being erected, contracts with B for the furnishing and putting in place by B of material in the building, the contract containing an express provision that B shall not assign the contract, or any part of it, or any interest in it, to any person, without having first obtained the written consent of C, A's architect, to the assignment, can B, without having first obtained such consent, assign any part of, or interest in, the contract to D so as to confer on D any right as against A?

If this question can be answered in the affirmative, the conclusion is inevitable that the restrictive clause of the contract, against assignment, is valueless to A, for whose benefit it is. But the restrictive clause is not valueless to A, who, having chosen his contractor, has undoubted right to so contract, that his dealings in respect to the subject-matter of the contract shall be solely with the contractor whom he has chosen, and not with some third person, chosen by the contractor, without his consent, and of whom he may know nothing. The parties to the contract, by making the restrictive clause a part of it, have impliedly agreed that the clause is of value and important. To hold it valueless would be practically to eliminate it from the contract, contrary to the well established rule that, in construing a contract, effect must be given, if possible, to every sentence, phrase and word of the contract. Appellant claims, as is necessary to his case, that by the assignment he had the right to receive from the university the moneys which should become due to Sammis by virtue of his contract. Appellant's cross-bill contains this averment:

"And your orator further represents that said F. H. Sammis duly and acceptably filled his said contract with said Northwestern University, and the said work and building were duly accepted by said Northwestern University, and said contract fully performed by said F. H. Sammis, to the satisfaction of said Northwestern University, and that, by reason thereof, the said sum of $17,142.69, and more, became due and payable to said F. H. Sammis from said Northwestern University, which said moneys were properly and solely payable to your orator by said Northwestern University."

The right of Sammis to receive moneys on his contract, from time to time, as his work progressed, is a part of his contract with the university, and an interest in the contract. Such right was the consideration for the performance by him of his part of the contract, and the assignment of such right is an assignment of a part of, and an interest in, the contract.

We can not conceive of any process of sound reasoning by which the conclusion can be reached that Sammis could assign any part of the contract, or any interest in it, without first having obtained the consent of the architects or of the university to the assignment, so as to confer on his assignee any right as against the university. That he could not so do is a proposition supported by well considered cases. Arkansas Valley Smelting Co. v. Belden Mining Co., 127 U. S. 379; Delaware Co. v. Diebold Safe Co., 133 Ib. 473; Burck v. Taylor, 152 Ib. 634; City of Omaha v. Standard Oil Co., 55 Neb. 337.

In 127 U. S., p. 387, the general rule is thus stated:

"At the present day, no doubt, an agreement to pay money or to deliver goods may be assigned by the person to whom the money is to be paid or the goods are to be delivered, if there is nothing in the terms of the contract, whether by requiring something to be afterward done by him, or by some other stipulation, which manifests the intention of the parties that it shall not be assignable."

In 133 U. S., p. 488, the court say:

"A contract to pay money may, doubtless, be assigned by the person to whom the money is payable if there is

nothing in the terms of the contract which manifests the intention of the parties to it that it shall not be assignable."

In Burck v. Taylor, *supra*, it appeared that the State of Texas made a contract with Matthias Schnell for the erection of its capitol building, in accordance with certain plans and specifications, Schnell to furnish all the labor and do all the work, for the consideration of the conveyance to him by the State of 3,000,000 acres of land. The contract contained the following clause:

" It is further agreed, covenanted and stipulated by the party of the second part, that this contract shall not be assigned, in whole or in part, by the party of the second part, without the consent, in writing, of the party of the first part, signed by the governor of Texas and the capitol building commissioners, with the advice and consent of the heads of departments."

January 31, 1882, Matthias Schnell assigned to Charles B. Farwell and others, including Abner Taylor, three-fourths of his interest in the contract, the consideration being that the assignees should furnish the money for the erection of the capitol, which assignment was made with the consent required by the contract. At the same date Schnell assigned one-sixteenth part of his remaining interest to A. A. Burck, to which assignment the requisite consent was not given. May 9, 1892, Schnell, for the expressed consideration of $15,500, transferred to Charles B. Farwell, John V. Farwell, Abner Taylor and Amos C. Babcock, comprising the firm of Taylor, Babcock & Co., the assignees in the assignment first above mentioned, all his interest in the contract, to which transfer the required consent was given. June 20, 1892, the firm of Taylor, Babcock & Co., with like consent, transferred the entire contract to Taylor, he undertaking to perform the contract with the State. April, 1883, A. A. Burck, for the consideration of $10,000, conveyed to S. B. Burck the one-half of the one-sixteenth interest assigned to the former by Schnell. No consent was given to this conveyance. After Taylor had performed the contract, S. B. Burck filed a bill against him for an accounting, and to recover what he claimed was his share

of the profits. The court held Burck not entitled to relief, saying, among other things:

" It is true that in the case at bar we have no construction of a statute, but only the terms of a contract. That contract, however, was as binding on the one party as the other. The contractor assented to its terms precisely as did the State, and his promise was not to assign the contract, in whole or in part, without the consent in writing of the State authorities. It was a promise which entered into and became one of the terms of the contract, and one which was binding, not only upon the parties, but upon all others who sought to acquire rights in it. It may be conceded that, primarily, it was a provision intended, although not expressed, for the benefit of the State, and to protect it from interference by other parties in the performance of the contract, to secure the constant and sole service of a contractor with whom the State was willing to deal, and to relieve itself from the annoyance of claims springing up during or after the completion of the contract in favor of parties of whose interests in the contract it had no previous knowledge, and to the acquisition of whose interests it had not consented. Concede all this, and yet it remains true that it was a stipulation which was one of the terms of the contract and binding upon the contractor, and equally binding upon all who dealt with him. It is unnecessary to hold that the contractor might not be personally bound upon his promise made before the performance of the contract to transfer a portion of his profits to any third party. Whatever liabilities he might assume by such promise, it would be an independent promise on his part, and would not let the promisee into an interest in the contract. It would give him no right to take part in the work, no right to receive anything from the State, and all that it would give him would be an independent right of action against the contractor for the failure to pay that which he had promised to pay, the contract remaining all the time the property of the contractor, subject to disposal by and with the consent of the State. To him alone the State would remain under obligations, and with him alone would the State be required to deal. In no way, by garnishment, injunction, or otherwise, could the promisee prevent the State from carrying out the entire contract with the contractor, paying to him the whole consideration, and receiving from him a full release."

In the case cited the contest was between assignees, and

the objection that the assignments from Schnell to A. A. Burck and from the latter to the complainant, S. B. Burck, were invalid, because made without the required consent, was made by Taylor, himself an assignee, whereas, in the present case the objection is made by the university, for whose benefit the restrictive clause was inserted in the contract. Therefore, the present case is stronger for the university than was the case cited for Taylor.

In City of Omaha v. Standard Oil Co., *supra*, the contract was between the city and the Metropolitan Street Lighting Co., for the lighting by the company of certain streets, and contained this clause:

" It is further agreed between the parties hereto, that the party of the second part shall not assign this contract without first obtaining the consent of the first party indorsed hereon, in writing."

The Standard Oil Co. furnished to the Lighting Co. the oil necessary to enable it to perform its contract with the city, and also loaned it considerable money, and the Lighting Co. assigned to the Oil Co., as security, the money due under the former's contract for the month of October, 1892. The Standard Oil Company sued the city and recovered judgment, which was reversed on appeal. The following occurs in the opinion of the court:

" The inhibition, it will be noticed, is not alone upon the assignment of the obligation to light the streets, but upon the assignment of the contract. What was the contract between the parties? Certainly one of its important elements was the duty laid upon the city to make monthly payments to the lighting company for the services rendered, and another was the correlative right of the company to receive such payments. The assignment of the October installment, if valid, not only transferred to the plaintiff a right secured to the lighting company by the contract, but affected, as well, an important obligation on the part of the city. It compelled the city to deal with strangers, and to determine at its peril which of the contesting claimants ·was entitled to the fund. This may have been one of the very contingencies contemplated by the city, and against which it sought to provide by making the contract nonassignable. Another object in view might have been to

prevent the company from losing interest in the performance of the contract, by divesting itself of all beneficial interest therein. But it is needless for us to speculate on the motives for the city's action. It is enough for us to know—whatever its reasons may have been—that it has, in plain language, stipulated against an assignment of the contract. That stipulation is valid, and must be enforced. To hold that it covers some, but not all, of the rights and obligations arising out of the contract, would be, it seems to us, an inexcusable perversion of its terms." Citing Burck v. Taylor, 152 U. S. 635.

But, even though the assignment were valid as to the university, we could not concur in the construction of it by appellant and his counsel, namely, that by its terms it conferred on appellant the right to receive, and imposed on the university, after notice, the duty to pay to appellant all moneys accruing due to Sammis under the contract. The transferring part of the assignment is as follows:

" Sammis hereby agrees and does transfer to said Mueller all the moneys, credits or choses in action, estimates, orders, etc., which may be made payable to him, or come to him under this—Sammis'—contract, or extra work and materials to be furnished by said Sammis, directly or indirectly, by said owners and their architects and superintendents, except only such sums as may be due or owing to other material men, sub-contractors or laborers outside of Mueller, and which said owners or their agents are compelled by the lien laws to pay and for the actual sums due the same respectively. It is agreed that such moneys and credits shall be retained by said Mueller and applied to any indebtedness which he may owe against said Sammis, and that the surplus, if any, in payment of all debts, losses and damages accruing to said Mueller by reason of the premises shall not become due or payable until said indebtedness to said Mueller as aforesaid shall be fully paid and said building completed, and said contract between said Sammis and said owners fully carried out, and the entire money provided for said Sammis in his said contract with said owners, together with extras, shall be fully paid to said Mueller, and said Mueller fully protected in the premises; said Sammis agrees that at any time hereafter he will execute such further orders, transfers and documents which may become necessary to carry out this agreement, or which may be

required by said owners, their architects and superintendents, or which said Mueller may demand."

It appears from the evidence that the assignment was prepared by Sammis' attorney. It must therefore be taken more strictly as against him. It purports to assign to Mueller " all the moneys, credits or choses in action, estimates, orders, etc., which may be made payable to him, or come to him * * * by said owners and their architects and superintendents, except," etc. The language clearly indicates, as we think, that the parties anticipated that money would be paid to Sammis, on his contract, by the university or its architects, and that estimates, checks and orders might be issued " made payable to him," which, to be available to a third party, would require his indorsement, and would, therefore, be delivered to him. This view is strengthened by the concluding words of the assignment:

" Said Sammis agrees that, at any time hereafter, he will execute such further orders, transfers and documents, which may become necessary to carry out this agreement," etc.

If the assignment itself was sufficient to convey to Mueller the moneys to accrue due on Sammis' contract, and to impose on the university the duty to pay such moneys directly to Mueller, as appellant now claims, why this covenant for further assurance? Moneys falling due under the contract, necessary to pay laborers employed by Sammis, and sub-contractors and material-men other than Mueller, were excepted from the assignment, and were to be used in paying such laborers, sub-contractors and material-men. There is nothing in the assignment which purports to impose on the university the burden of superintending the pay rolls or paying directly laborers, material-men and sub-contractors under Sammis, or inhibiting it from making payments directly to Sammis, either in money, or checks payable to his order. The use in the assignment of the words, " this—Sammis'—contract," indicate that the attorney had the contract before him when he drafted the assignment. It would be unreasonable to suppose that one contracting for a security would omit to examine the security contracted for.

Mueller v. Northwestern University.

It does not appear from the record how much money Sammis paid to laborers employed by him, and to sub-contractors and material-men other than Mueller, or how much remained of the contract price after making such payments.

The court, in the decree, found that there was an understanding between appellant and Sammis, that the latter should collect from the university the moneys accruing due under the contract, as the work progressed, and we think the evidence fully justifies the finding. The assignment was prepared in Cincinnati, where appellant lived, by appellant's attorney, and was executed there by Sammis. It seems from the testimony of Sammis that it was executed solely at the suggestion of appellant's attorney.

Sammis testified that after he signed the assignment in the office of appellant's attorney, he and appellant started to go to a restaurant, and, on the way, he said to Mueller he thought it, the assignment, nonsense; that Mueller would be compelled to come to Chicago and take care of the pay rolls, and pay the bills, etc., and Mueller said he would be d—d if he would do anything of the kind, and told him, Sammis, to go ahead and do the work, and draw the money, pay the bills and give to him what was coming to him, and that Mueller and he agreed to say nothing to any one about the assignment. Mueller's attorney had testified that, as Sammis was leaving his office, he told him to be sure and tell Mr. Graham, of the firm of Burnham & Company, about the assignment, which Sammis promised to do. Sammis corroborated this, but said he did not tell Graham, on account of the agreement between him and Mueller after leaving the attorney's office. Mueller, in his testimony, denied that there was any agreement or understanding between him and Sammis, as testified to by the latter, but the testimony of Sammis is corroborated by letters of appellant in evidence, and his, Mueller's conduct in reference to the matter. The following letters were written by Mueller to Sammis, at their respective dates:

"CINCINNATI, May 5, 1897.

F. H. SAMMIS, 159 La Salle St., Chicago.

DEAR SIR: * * * I hope that you will get a good,

first-class settlement out of Mr. Burnham for the bank job, and will make every cent of extras that you claim. If you succeed, as you doubtless will, in getting some funds for the bank building job, let me have as much as you possibly can, or let me have the amount which is due me.

Yours very respectfully,
JOHN M. MUELLER, JR."

"CINCINNATI, May 25, 1897.
F. H. SAMMIS, 159 La Salle St., Chicago, Illinois.

DEAR SIR: By all means get done with the marble work in the bank building by the first of the month, so that you can get this contract closed up and get your money, and, in turn, favor me with a check for the moneys which are due me. I need the money, and that the worst kind. I never in all my experience in the marble business was so crowded or pressed for funds as I am at the present time. This is owing to no other reason than simply because my funds are now tied up in the job which you are now completing.

Yours very respectfully,
JOHN M. MUELLER."

"CINCINNATI, May 27, 1897.
F. H. SAMMIS, 159 La Salle St., Chicago, Ills.

DEAR SIR: I hope that you will get done with this floor and that too, quite shortly, so that D. H. Burnham & Co. will give you a settlement in full of your account.

Yours very truly,
JOHN M. MUELLER."

"CINCINNATI, June 9, 1897.
F. H. SAMMIS, Chicago, Ills.

DEAR SIR: I am very seriously pressed for funds. I expect you to be here quite soon with a remittance or with a draft for the amount of money which is due me. I have promised several of my pressing creditors that on or about the 15th inst. I will be in shape to liquidate my entire indebtedness to them.

Yours very truly,
JOHN M. MUELLER, JR."

"CINCINNATI, June 11, 1897.
F. H. SAMMIS.

DEAR SIR: Just as soon as you get matters fixed up with Burnham & Graham for the bank building, try and make it convenient to come here and let me have the money which is due me on the bank building, and also on the Clinton and Wheaton job. I don't want to be too urgent in my demands, but my creditors here have been put off

Mueller v. Northwestern University.

from month to month with the promise that I would settle their accounts, but thus far I have been unable to do so. All the money which I get in now, in the way of collections, I am using here in the way of paying for wages, and all the material I am getting has not been paid for. So let me see you here at just as early a date as you can make it convenient to come.

JOHN M. MUELLER."

" CINCINNATI, June 17, 1897.

MR. F. H. SAMMIS:

DEAR SIR: I had all along hoped that you would get your money for the marble work which you did in the bank building before Tabor & Company would take any steps in trying to tie up these funds of ours. If you had followed my instructions or done as I wished you to do some three or four weeks ago, by accepting or giving me an order on D. H. Burnham & Co. for the amount of money which is due me, Tabor & Company could not do anything at all with me. I could bring them here to Cincinnati to do the fighting if any fighting was to be done. As it is, Tabor & Company look to me for the funds which I owe them.

Yours very truly,

JOHN M. MUELLER, JR."

" CINCINNATI, June 19, 1897.

F. H. SAMMIS.

DEAR SIR: I regret very much indeed to learn of your having such a difficult time in getting a settlement from D. H. Burnham & Co. for the marble work which you done in the bank building, and also that Tabor & Company are causing you so much trouble. From the letters which I received from you during the past few days I thought that you already had settled with D. H. Burnham & Company, and beat Tabor & Company at their own game. From your present letters, however, it would seem that you are not as yet done with Burnham & Company, or have not as yet reached any settlement with them, and also that Tabor & Co. are still in the way of your getting your money. * * * I am needing money, and that the worst kind. I have been putting off some of my creditors from day to day, telling them that I expected to get some funds from you, and they are seriously disappointed because I am not making good my words or my promise. Can't you send me at least a remittance on account? You owe me, according to my figures, some $16,000, and you should be able to send me at least $10,000 on account. It is not right or fair

to keep this amount of money from me, especially so as I owe it to other parties.     I will not pay Tabor & Co. in full until I see you, but there are other creditors who are deserving of their money."

The only explanation of the foregoing letters which Mueller vouchsafed is the following:

"Q.     There are several letters introduced here with respect to money that was due under this contract, which you wrote to Mr. Sammis.     I wish you would explain to the master what you refer to in those letters—what you mean by the statement 'your money' in your letters."

"A.     Well, Mr. Sammis always cautioned me not to write to Burnham & Graham for anything, to let him attend to it; and if there was anything I wanted I should write to him and tell him to do so and so and so and so.     Of course he didn't want Burnham or Graham to know that he was not capable of carrying on that work after having turned everything over.     I don't know exactly how he stated it—he didn't want to be queered in Burnham's office because this job would be the means of his getting all of Burnham & Graham's work from that on, and certainly I didn't want to do anything to hurt him; and I wanted to see Sammis get all the work that he could out of it, and as long as he was acting fair and straight with me I didn't care."

In a letter of date May 15, 1897, to Sammis, Mueller inclosed an order on Sammis, payable to Charles J. Boeh, for $14,133.74, requesting Sammis to accept the order.

In a letter of date June 5, 1897, from appellant to Marthens & Mead, Chicago, who had been trying to collect their claim against Sammis through appellant, he writes:

"Now, with reference to Mr. Sammis' business or his account, I beg to inform you that if he has told you that the settlement of the Illinois Trust and Savings Bank building is in my hands, he has misrepresented the facts to you. I do not have anything at all to do with the money; he collects the money for the work he has done, and remits to me the amount of his purchase or for the marble which I furnished to him.     You can see plainly and will understand that if the settlement of the bank job was in my hands that I would be only too glad to keep the amount of your claim out of the money coming to Mr. Sammis.     There is no reason, or I have no cause why I would not do this for you, but the facts are just as I give them to you.     Mr. Sammis

has the contract for the bank job, collects his money and sends me the amount of my bill for the marble which I furnished for this job."

Comment on the letters is unnecessary. They are consistent only with the understanding of the parties to the assignment that the moneys falling due under the contract between Sammis and the university should be collected by Sammis, and that Mueller, after such collection, would rely on Sammis for payment of any moneys due to him under the assignment. Whether this understanding was in consequence of an agreement between Sammis and Mueller, as testified to by Sammis, or of the construction of the assignment by Sammis and Mueller, we regard immaterial. We are of opinion, as heretofore indicated, that the assignment is susceptible of the construction that Sammis was to collect the money. Mueller never presented, either to the architects or the university, the assignment, or any copy of it, nor did he give any notice of it, unless the language quoted from his letter of December 11, 1896, in the statement preceding this opinion, can be called a notice, nor did he, in any way, demand payment from the architects or university, although, as his letters indicate, he must have known that moneys were accruing due to Sammis, under his contract, from time to time. Mueller did not come to Chicago, after the execution of the assignment, until he came as a witness on the hearing of the cause. In June, 1897, after Sammis' entire contract price, except $4,403.39, had been paid to him, he sent his attorney to Chicago to look up the matter, and the attorney called at the office of the architects and did not then demand payment, but merely requested Mr. Graham, one of the architects, not to pay any more money to Sammis.

Mueller testified that May 8, 1897, in Cincinnati, Sammis paid him $5,000, which he says he supposed Sammis got from the building. Mueller testified that at the time of such payment nothing was said as to the source of the money, but Sammis testified that he told Mueller that he drew an estimate and got $5,000 on it, and the uncontra-

dicted evidence is that May 1, 1897, the university paid $5,000 to Sammis.

Appellant's counsel object to the evidence tending to prove an agreement between Sammis and Mueller that the former should collect the moneys, on the ground that the assignment, being under seal, can not be varied by parol; and cite cases to the effect that in a suit between parties to a sealed instrument, the defendant can not set up a subsequent parol agreement to vary the terms of the instrument sued on. Such cases have no application to the present case. This is not a suit by one of the parties to the assignment against the other party. The parties to the agreement had legal right to abandon the entire assignment, or any part of it, if they saw fit so to do, and on the hypothesis that the assignment imposed on the university the duty to pay to Mueller, directly, the moneys due to Sammis, under his contract, to which we do not assent, it was clearly competent for the university to prove that Sammis and Mueller agreed to abandon, and did abandon, that part of the assignment.

Counsel for appellant further contend that the university is estopped to deny the assignment. We find no element of estoppel in the record.

It is lastly objected that interest should have been allowed on the balance due Sammis, which, by the decree, was awarded to appellant. We can not sustain this objection. The university, by request of appellant's attorney, made in June, 1896, withheld from Sammis the balance due him; appellant and Seaman, another defendant to the bill of interpleader, both claimed the balance due Sammis; the university, by its bill, offered to pay such balance into court, and promptly did so, when ordered by the court. It was a mere stakeholder, and was only prevented from paying to Sammis the balance due him by the conflict between his creditors.

The decree will be affirmed.